Council, the first case today is 13-2262 United States v. James Prange and 13-2328 United States v. John C. Jordan. Council, please proceed. Good morning, Your Honors. May it please the Court. I would like to take eight minutes for my main argument and reserve five minutes of my 13 minutes for my rebuttal. Your Honor, this is a case about entrapment. This is a case about legitimate businessmen looking for financing for their companies. My client was one of them, Mr. Jordan. My client was not the financial guy. My client was the fish guy. My client came to a meeting where he expected to get financing, a very costly financing agreed, but financing. At that time, the government had set up a sting in order to draw him in to make him believe that this arrangement was something that he should be able to do and that it could be legitimized through the documents that were provided by the government. The fundamental difference in this case from the entrapment cases that are cited by the government is that what was happening in this so-called scheme, in this setup, this sting, was not inherently illegal. This was not a robbery case. This was not a drug case. This was not child pornography. This was not a terrorism case or a murder case or any of the other cases that were cited by the government. What about the kickback? Your Honor, it wasn't an illegal kickback. And as you can see throughout the testimony, there's the notion that the kickback is essentially a fee and it's discussed as a financial fee. And indeed, some of that 50% fee was discussed as being more attractive than some of the other legitimate ways of obtaining financing. When my client got there, Your Honor, his actions before and after show someone who believed that this was legitimate financing, at least up to a certain point, legitimate financing, and that he had to sell his company because his company had value. The problem I have with that argument, counsel, is that that doesn't seem to me it goes to entrapment. It seems to me that goes to the scienter element of the crime. The intent of your client, that element was resolved against you by the jury and isn't a subject of this appeal. Well, Your Honor, the government attempts to decouple intent from predisposition. And that intent issue is essential for the predisposition. But what I'm struggling with is the idea of what did the government do here that was improper? Usually on an entrapment case, there is some evidence of improper inducement where there is something coercive or something sneaky that the government has done to dupe the defendant into coming into the scheme. I read your brief and I have difficulty coming up with anything of that nature here, certainly not enough to warrant a judgment as a matter of law. Well, Your Honor, the inducement is having someone come in and hide from them the true nature of what the scheme is going to be. Not being honest and upfront. What was hidden from them other than the fact that this was a sting operation? Your Honor, a lot of the language of the agent meant to make this a legitimate transaction. Saying things like this is not going to hurt my investors, that it's coming out of my own pocket, that this will be legitimated through the use of the invoicing, providing the invoicing. Here comes someone in. And in some ways, Your Honor, this is a case where the government is creating a crime. And they're taking a desperate businessman. Now, the desperation is an element that has been seen in the cases where you take someone you know is desperate for a crime. You have no information that this person has been seeking illegal funding. You have no information that this person is even a target. They didn't even know about my client until he walked in there. That's part of why I'm struggling with this inducement idea. The government didn't go after your client. He was recruited by his co-defendant, wasn't he? Through the confidential informant, Your Honor. But the government didn't know anything about your client until the co-defendant, Prang, brought him into the mix. Yes, but they treated all of them as if they were going to bring them into this snare, Your Honor. My client was particularly vulnerable. One, because he was a fish guy whose mother tongue was Spanish. He was not the financial guy. There's not one that the informant didn't have a conversation with where he told him it was illegal. My client continued, and I think what's compelling about my client's situation is that the post-trash and the post-meeting on August 22nd shows how he believed that this was going to be a deal that was going to be good for everybody, as indicated by the agent. He continued to provide pitch materials. He continued to provide brochures. In fact, the agent admitted that he was buried by the paperwork. He asked for $0.12 instead of $0.08. That's someone who's thinking this is a financing illegitimate. And the government, rather than doing... Oh, I'm sorry. Aren't you arguing mens rea intent? In other words, for entrapment, before you even get to disposition, you've got to show some improper conduct by the government. And what you keep focusing on, and what I'm hearing you say, is that Mr. Jordan didn't think what he was doing was a crime. He didn't think it was wrong. He thought he was getting legitimate financing. Didn't the jury resolve any issues of intent against your client? Your Honor, the inducement was the government failing to make clear to my client that this was an illegal transaction. And if he didn't know it was illegal, then wouldn't he have won on the merits? Well, there came a point where it was clear that he was acting as if it were illegal, and we don't dispute that. And that he continued to act after that point. Pardon me? And so he continued to act after he knew it was illegal. At that point, when he's, or at least should have been on notice of it, is when he's still... I mean, it's not clear, but to the extent that there's a finding that what he did was illegal, providing the invoices, I think that's a critical juncture. But prior to that, Your Honor, you have a situation where the government never says, not to my client, and I think that's why Mr. Jordan's case is different from the co-defendant's, because they never say to him, this is illegal, this is fraud. They basically use terms that are just as legitimate as any other transaction. And that's where I find, and I think that a court of law can find as a matter of law, and the government's notion that if he had provided words like fraud or he had provided words like illegal, that that would have blown his cover. This is not that kind of case. This is not a drug case. Let me ask you this. So if I understand you now, I think what you're saying is that the improper conduct that you're alleging is that they made the transaction look legitimate to reel him halfway into it, and then it was only when he was already caught up with it that he found out it was illegal and he didn't abandon it at that point. Correct. Do you have any precedent that that type of approach by the government is the type of conduct that gets us to the second branch of the entrapment inquiry? You know, is that it's sufficiently wrongful inducement? Well, Your Honor, as you know, the cases that deal with listings of the events that can cause inducement are not exclusive. This is a very unusual case. This is a case where the jury was out for three days. This was a very close case. And you have to couple what Your Honor said also, knowing that he was desperate financially. And that is the combination. And that desperation and exploiting of that desperation is what gets you into the entrapment and then to the predisposition in terms of intent. Thank you, Ms. Parsons. Good morning, Your Honor. Good morning. My name is Stephen Fuller. I represent James Prange. We're here on appeal. Mr. Prange was convicted of three counts of conspiracy to commit securities fraud. In my argument, I'd like to reserve four minutes of rebuttal of my remaining time. Let me skip right to a couple of points based on the questions that the panel had, and that is what is the conduct that was the inducement? And you asked if there was a case. And the case we're relying on, Your Honor, is the Gendon case. And in Gendon, the court specifically addresses that issue on whether or not the normal indicia of inducement, excessive pressure, taking advantage or exploiting certain conditions are present in that case. But its rationale is particularly useful here. Here where the government noted that it's a tool or advantage of a non-criminal motive, creating a corrupt enterprise and then solicited non-criminals to see if they could figure out if it was a crime or an enterprise in which they would participate. And what the court had said is that the focus is on the method of inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit a crime. And I submit to you that there was plenty of evidence to show that that was exactly the case. Here what we had was a sting, a legitimate enterprise pitched to the public that we invest in two types of securities transactions, or we offer two types of funding, whether it's a fund of last resort, investing in restricted stock or publicly available securities, or a lender. They do two things. They have what they call loosely legitimate clients where they go in, they do a lot of due diligence, but they're all micro-cap companies. They go in, they do a lot of due diligence. For example, it would be like a drug company where they go in, they analyze the patents, and they do all that type of work. And they have these flyers that he calls illegitimate companies. Now, the terms legitimate and illegitimate, they're suspect, but if you're looking at the context of what the evidence was, he does these illegitimate deals because he doesn't do any due diligence. But these are flyers. All they have is a business plan. There's no due diligence to be done. So what he's telling you, on the one hand, looks a little suspicious in the testimony of the agent at trial. He would explain what he meant by all these terms. But he never explained it to these businessmen who came to the transaction thinking it's a legal transaction. What he told, and the information is carefully layered in each phone call, and if you look at the progression of the transcripts, it's carefully layered. When Mr. Henderson first contacts Jim Prange, he testified on cross-examination that he didn't tell him the terms were illegal. He didn't tell him about the kickback terms. What he said was that this is expensive money, and he says, well, when I questioned him about what he discussed as what was illegal that he should have known was illegal, he said, well, I was just warming up. This wasn't a baseball game where you're warming up. These are real people's lives. It's their real futures, and it's the future of companies. And they carefully orchestrated and layered the information that they would make available to these targets. First, it's expensive money, but we're a $3 billion hedge fund. You're paying a 50% fee, you're kicking it back to me, it's going back to me. Then later on, well, my fund doesn't know. Then it's later on, my partners don't know. He never says, I'm ripping off the fund, I'm stealing the money from the fund. There's never any evidence in this entire case that the fund didn't know a fee was being paid. All the evidence was and all the agent ever said was that the fund doesn't know I'm receiving the fee. I'm struggling with the notion of where the improper inducement is. Again, this all may be a good argument on mens rea. Your client didn't intend to do anything illegal. But that was submitted to the jury, and the jury resolved that against them. What did the government do here that was improper? That's what I'm struggling with. The improper inducement is the very structure of the entity. This isn't people joining together to use illegal means to commit a crime. Here, it's a legal enterprise where they're using arguably illegal terms to get people to invest. But it's the layering of the information over the course of time and the ambiguity in the terms that they use and how they pitch it. They targeted a specific kind of individual, companies that were down and out, executives trying to save their companies, and gentlemen like Jim Prange who survive on investor relations work for these small companies, and if they don't get funding, he goes out of business. They all know that this is what he does, and he makes introductions to these companies, and he makes every effort to introduce an opportunity and let executives decide whether or not to invest. So the inducement is the very structure of the transaction. It's the layering of information directly to the people to get them into the investment thinking it's legitimate, and then give them enough terms and enough ambiguous terms that these people don't understand that this is clearly an illegal opportunity from the get-go. You know, I can see how a smart lawyer might be able to convince a jury what you just said is so, but I can't for the life of me see how that can add up to improper inducement as a matter of law, because that's what you want us to do. You want us to say that improper inducement is so clearly proven here that there wasn't even a jury question about it, and I keep going back. I look at what the government did here, and yes, I can see how you can put a sinister face on it, but to say that it's improper with the degree of clarity that would support a Rule 29 motion, I'm really struggling. If you can help me, I'd appreciate it. Let me see if I can try to help you address that issue, Your Honor. In a criminal enterprise like drugs, trafficking, pornography, any of those things, the people coming to the transaction clearly know that this is illegal conduct, and they either join in or they don't. If the government takes steps to induce them. That's actually not always the case. If you look at a number of our guard track case and other cases, the hook is often dangled out there first with some ambiguity, and then more information is supplied as it looks like the person has some interest, and fact issues get generated that then need to be decided by the court. But the underlying enterprise is generally clearly illegal where there's guns involved or traffic and pornography. But when you're talking about investment and you're talking about so-and-so doesn't know, don't tell my investors, they don't need to know, it seems to me those are the equivalent of cocaine in the investment world. White-collar crime, we don't see as much of it on TV, but if you're in the investment world, those are pretty good signals. Well, it's interesting you use that example, because here the crime is stealing money from the hedge fund investors, correct? And if that's the case, someone ought to have said that was stealing money from the investors. But what he says is that I'm not telling my partners I'm receiving the fee. Not that the fund doesn't know the fee is being paid. And, in fact, the public records that are disclosed in these transactions all show that the fund only is buying the stock and that the company in which they invest is only keeping 50 percent of the money. That's in the public filings. So everything they did to structure this transaction was ambiguous and self-contradictory. We're not going to document any of this, because we don't want our partners or the fund to know about the nominee accounts and the money where it's going. Yet, in the file for a $3 billion hedge fund, there's going to be a consulting agreement showing that 50 percent of the money was paid back by the company to another entity. The public filings show the same. You're using your rebuttal time now. Thank you. Good morning, Your Honors, and may it please the Court. Dave Lieberman for the United States. The defendants have focused exclusively on the entrapment issue, so I will follow where they have led. Both defendants are raising sufficiency challenges based on this one issue. The jury in this case, viewing the evidence in the light most favorable to the government, could reasonably reject the defendants' entrapment claims. Wait a minute, Counsel. I didn't think that they attacked the sufficiency of the evidence in this case. I thought it was clearly all they're asking is a matter of law, that there was illegality here. That's right, Your Honor. This Court has said that the Rule 29 sufficiency standard is the standard by which we will judge an appeal of a jury's denial of an entrapment claim. And so that's how I have proceeded in my brief. The question in this case is could the jury reasonably find that no improper inducement occurred? And the answer is yes. They had a front row seat to all of the interactions in this case, all the videos, the audios, the e-mails. They saw every interaction between our undercover agent and these two defendants. And they were in a prime position to judge whether or not our agent's conduct here was improper, and they received the First Circuit's standard jury pattern instruction on how to determine whether an inducement was improper. They found in the negative, we can assume, and that judgment is unassailable on appeal. I have not heard anything this morning analogizing the government's conduct to any of the categories that this Court identified in the Gendron decision, which are illustrative, but they're illustrative for a purpose. There was no forceful solicitation, threats of violence. These defendants were not desperate for food, desperate to save their child custody. Our agent did not dress up as a suicidal person and conscript the defendants into this crime. Our agent offered these defendants the ordinary opportunity to commit a securities transaction as well as the proceeds of that transaction. Well, in fairness to the defendants, there is a suggestion, more than a suggestion, in their briefs, that Jordan was financially desperate in the sense that he was trying to keep his company's head above water and so was inclined to look favorably on any investment deal that promised to give him the funds, and that the government exploited that type of desperation.  I have not found any example in the case law where a desire to help one's business rises to the same level of the vulnerabilities identified in Gendron, but assume that it does because this is a fact-specific inquiry. There was not evidence of that. Mr. Jordan did not present any evidence that he was operating under this save-the-company desperation, and his conduct immediately after the meeting with the undercover agent would have undermined such evidence. As soon as he received the hedge fund money, he diverted it to his personal accounts, his personal credit card, as well as the accounts of his attorney, his niece, and his business partner, all personal accounts. The jury could look at that and fairly question the assertion that this is a man who is an innocent company CEO trying to save his company when, in fact, all the money is then diverted to personal accounts. Now, on cross-examination and I think in closing argument that if defendants offered a story, well, we were using our personal accounts to purchase business items. There was no evidence of that. The jury was entitled to reject that. I think that the defendant's entire claim on improper inducement distills down to the government needs to effectively do a Rule 11 colloquy in Sting's. Do you know this is illegal? Do you know that you are, in fact, harming this particular investor? Is this abundantly clear that what you're doing is fraud? And that's just not the way that these cases roll. The jury in this case, with their front row seat, easily rejected the entrapment claim. I want to also mention predisposition for a second because that is the second prong of the inquiry. And I think predisposition is readily apparent in the record, certainly enough for the jury finding. At every opportunity, every phone call and email, Mr. Prangy sought to expand the stock for kickback deal to additional companies, expand the program beyond its additional moorings. And this court has said that that desire to expand and engage in new criminal opportunities defeats an entrapment defense. On Mr. Jordan, it's important to look at what he did immediately after the meeting. Recall that our agent did not let him sign the stock subscription agreement at the meeting. Mr. Jordan wanted to. The agent said no. He sent Mr. Jordan back to California, 3,000 miles away, in the comfort of his own home. And then Mr. Jordan fills out the stock subscription agreement, emails it to the agent with the notation, please sign at your earliest convenience. So at that point, Mr. Jordan is 3,000 miles away from the allegedly improper inducement in this case and still jumps in with eagerness and enthusiasm. That defeats his claim of entrapment. He did provide stock. What was it, 400,000 certificates? Yes, Your Honor. And it seemed to me that you argued to the district court, the government argued to the district court, that it didn't need to consider the value of that stock in calculating the amount of the loss because it was a fraudulent transaction. So our argument to the district court was that this stock could not be valued. And the district court, looking at the record, correctly declined the defendant's offer to offset the loss amount. And I can explain why in detail. The probation office set or recommended a $32,000 loss for the sentencing guidelines calculation. It was then up to the parties to object if that was the wrong valuation. Mr. Jordan, and also followed by him, Mr. Prang, he said, no, you should value that 400,000 shares at a $0.04 to $0.05 range and then deduct accordingly. That $0.04 to $0.05 range was the range that unrestricted shares traded on the market in August 2011. The district court rejected that valuation and that was correct because there's no dispute that these shares could not have traded in August 2011 at that range, that $0.04 to $0.05 range, because they were restricted. The defendants did not offer up any alternative objection or any other way to value the amount of loss in this case. And under Rule 32, the district court ruled on the objection, the arguments presented for it. There's no clear error in rejecting the defendant's incorrect valuation and then adopted the probation officer's recommendation. But it doesn't seem clear, does it, that the court found the stock worthless, as opposed to accepting the government's argument that either because it's fraud you don't need to find anything about the value of the stock, or secondly, because it was restricted, it didn't have value. And it seems to me neither of those arguments are correct. So as I read the transcript, I thought that the district court accepted the second one of the government's argument about that these stocks were unvaluable in light of their restricted nature. Now, the record is silent as to what one needs to do or when those stocks could possibly become unrestricted and have value. The government witness said that they have no value because they're restricted. No witness, best as I recall, said that they have no value. The question of value is at a particular time. And our argument was that as of the time that we're trading them, as of the August 2011 date that the defendants are talking about, there was no value because they could not be traded. It's possible. It's not in the record that I don't know what the vesting condition was on these restricted shares. It's possible that based on whatever condition it was, at some point in the future there could have been an argument that these shares had value, but that was not presented by the defendant. They did not offer up an alternative method of valuation. And so the district court took the arguments that it had in front of it and ruled on it. And I think on this record there's no clear error in how the district court made its judgment. The district court only needs to come up with a reasonable estimate of the amount of loss. So as I understand what you're saying, Mr. Lieberman, the district court, as I understand it, found that the restricted shares had no value. What you're saying now is that there was no evidence that the restricted shares had any particular value, and thus the district court was entitled to disregard them in the amount of loss calculation. Yes, that is my position, Your Honor. Because in amount of loss it's the burden of the defendant to show the evidence of anything that he proposes to be a set-off to the amount of loss? I think under Rule 32 that's right in that there's the $32,000 proposed by the probation office. And then it's up to the parties. If the government thought that that was wrong, it would be on our burden to file an objection and say, no, you should value it higher. The defendant wanted it lower. They have to come in and explain why it should be lower. And the district court rules on the evidence and arguments that it had before it. So I think the district court here acted quite reasonably. And certainly its decision is supported by the factual record that it had in front of it. While we're talking about the reasonableness of the court in regards to the pre-sentence report, the probation did not recommend a four-point enhancement, which you were requesting. Correct, Your Honor. The court did allow for a two-point. And in this record, I can't find, and maybe you can help me out and you can cite to me exactly where Mr. Prangek acted that he controlled, organized, or managed criminal actors. So this court in the Savarese decision said that the act of recruiting constitutes organizing under 3B1.1. And the evidence in this case certainly supports a conclusion that Mr. Prangek was organizing because this entire scheme would not have occurred had he not brought in the three executives into the scheme, Pearson, Jordan, and Berman. And that alone supports the district court's factual conclusion. Which factual conclusion? The district court's factual conclusion was that he managed. Yeah, I'm sorry. That is a mixed question of fact and law. But now you're saying that he could have found that he was an organizer. So the district court's holding was Prangek was at least a manager and supervisor. He did not say organizer. I think that the district court in reaching that ruling was simply just saying, I find that this enhancement applies here. 3B1.1, the two-level enhancement applies. And recruiting is managing and organizing under Savarese. And that is enough to support the district court's conclusion. We think that Mr. Prangek did a lot more. He was essentially the gateway for these executives to the undercover agent. He organized their trips. He ensured the timing of the tranches. That, above and beyond the recruiting, shows a level of organization and a level of management that is sufficient to sustain the enhancement. He doesn't need to be at the top. He can be mid-level. This court has said that on a couple of occasions. But the factual record here supports the conclusion, both on the front end and the recruitment and the organizing these executives' entire interactions and all of their conduct in the scheme was enough for 3B1.1. But what's troublesome about your approach to both amount of loss and this leadership enhancement is that you want us to take conclusions that the district court reached, that the enhancements apply, and you want us, in effect, to make the fact finding that the district court never made. You're saying, well, the record would have supported a finding that the restricted stock was valueless. Well, the record would have supported a finding that there was recruiting here and that recruiting can be organizing. But the district court didn't make those findings. And I'm wondering about the extent of our authority and the wisdom of a practice that says that when a district court doesn't do its fact finding properly on the record, the court of appeals should just go ahead and look at the underlying record and make the fact finding and say, well, the district court could have done this. Not the district court must have thought this, because those cases we've got. But the district court could have thought this, and therefore will let the enhancements stand. To the extent that the court is concerned that the district court did not make any particular factual findings, it can remand, and then we can go and have a resentencing and ask for factual findings with greater specificity. On the two-level enhancement for organizer-leader, I think it is quite obvious that the district court necessarily found the factual arguments that I am making, because these were the factual disputes that were presented to the court, the only factual disputes presented with the court. So the court obviously rejected the defendant's arguments, sided with the government's view of the record on that one, and I think in light of the data points that we have, this falls under the line of cases which we can say with fair certainty that the district court made the conclusion that Prangee was an organizer-leader or manager for the two points, based on the arguments that the government presented. I'm happy to address any of the other claims that the defendants have raised. They've raised a number of them. If the court has any concerns. Seeing none, I would ask that the court affirm the judgments below. Thank you. As the United States court said in Jacobson, when the government's quest for conviction leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, would have never run afoul of the law, the court should intervene. We have a combination of a desperate businessman and the obfuscation of the illegal nature deliberately of this scheme. That is the inducement and improper behavior of the government which should be in fact controlled and discouraged and stopped. The sting operation ensnared these businessmen who needed these funds, were desperate for these funds, talked about paying 50%. In fact, some of them were going to go even higher in terms of the financing fees. Now, the government talks about the fact that this was just an ordinary opportunity. It wasn't an ordinary opportunity. It was a sting operation. And what's concerning is the way it was described to my client, it became very ambiguous about what its real nature was. And that was done deliberately. For example, the government talks about that it clearly was going to be fraught. It wasn't clearly. I can make money, this is the agent, to my client. I can make money, then everyone's going to make money. So if you're comfortable with that, that's what we'll do with a consulting agreement. That's the kind of language that's throughout this interaction. Now, understand that my client had no dealings with Henderson. My client had no dealings with anybody on the record other than this first meeting on the 22nd. That first meeting on the 22nd, and this agent, and by the way, the court allowing him to describe what my client thought, what he thought, and what he meant, and I've detailed that. I don't have time to go into that. I have detailed that in my paper added to the final verdict of the jury. And that was not, as the government asserts, easily rejected. That was three days of deliberation, Your Honors. Counsel, you're making, again, to me the same argument that you made originally, and it goes back to me, the question's already been asked you. It seems to me like your argument is that there was nothing illegal here, and that seems to me to go to mens rea. Well, there was nothing illegal that was definitively illegal at the outset until he was entrapped. But you don't attack the sufficiency of the evidence, though, in this matter. No, it is as a matter of law, Your Honor. I think it's this in fact behavior that needs to be stopped by the courts, that when you have a not inherently criminal crime. Counsel, I understand that part of your argument. Let me ask you this question, too, because you raised the issue. Do you have any cases or authority that says that it was improper for the trial court to send the indictment to the jury? Your Honor, I cited in my reply brief a couple of cases where the Ninth Circuit had said that they thought there were a lot more risks than there were benefits. There was a case in which they had additional charges that had been dismissed. In a way, we're in that same position. So you want this circuit now to write a rule that says that that is contrary to the law and that that should not have been given to the jury? You don't have to go that far, Your Honor. There should have been a full redaction. The actual charges themselves are not the problem. These indictments, as I've indicated, are starting to sound like somebody's thesis, post-grad thesis, and the government is taking advantage of that. That information did not need to be given. Let me go to this question because you alluded to it here in your rebuttal. How do you get around the, I believe, the Albertelli case when you talk about the admissibility of the agent manager's testimony? You referred to that just a minute ago. But how do you get around that? Your Honor, there's no foundation that was for that. These terms were not, with maybe the exception of kickback and tranche, the terms that were being asked to be explained were ordinary jury terms. To the extent that there were specific terms or financial terms, that's an expert. So government can't have it both ways. Well, from looking at the record, I thought he was testifying as a lay witness. That's what they're claiming. And to the extent there's a lay witness, there is no foundation that that code and those terms were ever something agreed by my client. Again, this is not a drug case. These financial terms, essentially what the government was saying, we want a mini closing argument after each time the agent talks about what he, not what he said, but what he meant was said. And even more concerning to me, what my client thought or meant. That's the province of the jury. He is a lay person. There was no foundation that he had any dealings with my client beforehand, that he would understand what my client knew beforehand. That meeting where he is explaining that was their only meeting. There was no history of interactions between them. The failure of that foundation under Garcia requires, although it's not this circuit, but it was cited by the government as well, and the analysis of that requires that all of that should have not been in there. Had it not been in there, Your Honor, my view is that the predisposition and intent issues would have been in our favor and that the three days of deliberation would have had a very different ending. Thank you, Ms. Foster. Thank you. Your Honor, on my rebuttal, I'd like to address a couple of issues that the panel raised. Let me ask you a question so that I can have my own mind clear about this. You did not object or raise the issue of foundation by the agent who was testified. Is that correct? No, Your Honor, we did not. All right. So you would agree then that that argument, as far as you're making, we would review that under the plain error. Yes, you'd review it as plain error, but if your outcome supports the arguments of my co-counsel here from Mr. Jordan, there would be no conspiracy to which Mr. Pranghi could have joined. With respect to the sentencing guideline enhancement that you do review for clear error, the court found not that he was an organizer here. The court found that he managed certain activities of the conspiracy. He did not find that he managed any particular conspirator. The law under U.S.C. Fuller talks specifically about control over not just activities, but of persons, persons that are part of the offense. The court offered no specific reasoning or rationale for its enhancement, other than making the comment at the initial outset of the sentencing hearing, which he said that he thought Mr. Pranghi was up to his eyeballs in the conspiracy, and then later on at the close when he sentenced Mr. Pranghi, that Mr. Pranghi had a lifelong experience in the securities industry. There was no evidence in the record that Mr. Pranghi had a lifelong experience in the securities industry. In fact, he had simply been registered as a securities broker who sold real estate partnerships back during a period of time in the 80s. But to the extent that the language you just quoted has any application at all to this case, control has to be understood in a very specialized way, because otherwise you completely undercut what we said in Savarese. When an individual recruits others to come into the scheme, I suppose it can be said that he has some control over them or they wouldn't have come, but he doesn't have the degree of control that we think of in a hierarchical chain of command. He doesn't manage them or supervise them, but we've said that that sort of recruitment is organization and can support the enhancement, and that's precisely what Pranghi did here, at least what the evidence indicates he did. Well, one would presume that when you're just recruiting, in a conspiracy charge, the recruiting, that was Mr. Pranghi's role in the conspiracy. That is the offensive conduct that constitutes the conduct that was the basis of the conspiracy claim. He doesn't exercise any control or influence. The fact that it's part of the activities for which he's charged doesn't save him from the enhancement. We have a case like Savoy in which the mayor's assistant was charged with participating in the conspiracy by doing acts which included his supervision of the underlings, and yet that supervision was the basis for a leadership enhancement. So the two aren't mutually exclusive. They're not mutually exclusive here, but there are two factors that the court should direct its attention to. First, when Mr. Pranghi introduced the three executives, one, he had not been offered any compensation to do so. Two, what he had been told was that this was essentially a legitimate enterprise, that it was expensive money, and that these people would have to speak to the hedge fund manager, the undercover agent, and learn about the transaction, the details of the transaction, and make their own decisions about whether to invest. There was no evidence that Mr. Pranghi influenced those decisions or that he negotiated those transactions. All there was was some evidence that he received post-event emails that there was no evidence he had ever opened or seen. Thank you, Your Honor. Thank you, Mr. Fuller.